Maureen White here from Richmond represents William Cole. We're asking the court to vacate the underlying convictions in this case and to enter judgment on behalf of the defendants and the alternative, we're asking the court to award a new trial. We have raised several issues with the court and I will address three. The first deals with jury selection in this case and that is the refusal of the trial judge to allow discovery into the jury selection process. Why wasn't that waived? It was not waived. Why wasn't it waived? That is a Sixth Elective Service Act. We submit that that is a constitutional right and that is never trumped by any statute passed by Congress. In this particular situation, we raised that statute, excuse me, we raised the Sixth Amendment twice with the district court. Immediately before the trial and then following the trial. We think the judge was presented with significant facts that would justify discovery and those facts are there were two defendants in this case. Both were African-American. In addition to that, we know that approximately 11.6% of the population of Northern Virginia is composed of African-Americans. In addition to that, we know that on the 45-member jury panel, there was not one African-American. Consistent with that, I attached to my pleading with the district court and to this court a study that was promoted and led by Duke University. We think that study is very significant for this reason. It establishes two things. One, race matters. That the color of your skin is more important than the content of your character. And that study is described on page 158 of the joint appendix. Let me ask you this. He didn't challenge the district court's denial of his motion to strike the jury panel. Isn't that correct? Instead, he asserts that the district court erred in denying his post-trial motion for discovery. Yes, sir. Well, then, why isn't that too late? Why isn't that a waiver as Judge King has indicated? Well, I based both motions on the Sixth Amendment. That is the lack of any... Did you make the motion before trial? Yes. I made two motions. One was pre-trial and that was the motion to strike the jury on the jury panel subsequent to the trial. And that was a post-trial motion. Both motions were based upon the Sixth Amendment. That is the absence of African-Americans on the jury panel. And I cited that study pre-trial and raised that study again post-trial. The importance of that study, as I say, is two-fold. One, it speaks very clearly as to why race matters. It just does. And secondly, that is a study that was not before prior courts in the Fourth Circuit that have decided this jury issue. So we believe, we submit, that discovery was required in this case. Or to say it a different way, to use a sports analogy, you can't get to home plate without getting to first base. And effectively, the decision of jury, picking juries, without identifying how, going into the specifics of how juries are selected. And essentially, that's what we were asking in this case. So no, I don't believe that any waiver occurred. I believe we've been consistent all through this case. What facts did you assert in your pre-trial motion? Same facts. No African-Americans on the jury panel. 11.6% of the population in Northern California said there were two defendants who were African-American. Are you appealing that order in that case? The judge's ruling in that case? Yes. I know that's a simple question, but I just did not understand that. I'm sorry. I thought I was being clear. We are appealing, and the gist of our jury argument is the judge refused to allow discovery into the jury selection process to determine the post-trial motion. You're not appealing the pre-trial ruling, your motion to strike the jury panel? Yes, sir. You're not appealing that? That's correct. Okay, now we're on the same page. And so the gist of my argument is that the judge should have allowed us to get to first base effectively in light of the facts that he was presented with. We believe this was a particularly important issue in light of the evidence that was offered in this trial, which we submit was thin, and I'm thinner than thin. And I'll get to that right now. I mean, I understand what you're saying, but even though the trial didn't include any African-Americans, how did that create an inference of systemic exclusion of African-Americans in the selection process? Well, we don't know that it did, and that's the point of my argument. Well, that's the point of my argument. It's just conjecture. You didn't offer anything. You offered any statistics? We didn't have the opportunity to offer statistics because we needed the opportunity to conduct discovery, and we asked the judge for some very specific forms. This was a post-trial motion. It was. Yes, sir. And so far as the sufficiency of the evidence argument, we feel very strongly about that. We think it is entirely consistent and resembles very closely the U.S. v. Bonner case that was decided from this court in 2011. We think it's even stronger from a defense point of view than Bonner was. In Bonner, there was a robbery case, and it was the use of a firearm in connection with that robbery. The jury found for the government. The district court judge reversed and felt the evidence was insufficient as a matter of law. We think, and the case was appealed to this court by the government, this court found that there was insufficient identity evidence and found that as a matter of law, the evidence failed to rise to a level of proof beyond a reasonable doubt. Again, that was a 2011 ruling from this court. We think it's stronger in this case, and here's why. Not only was there no identification evidence in this case, but the identification evidence suggested someone other than one of the two defendants committed this crime, and this is what I mean. The government has alleged that my client, Corey Jones, wore a dreadlock wig. Two bank employees testified during the course of the trial. They were government witnesses, and the government asked them specific questions about who and what they saw. Those bank tellers indicated that they did see a person that was African American, wearing dreadlocks, who was possibly in his late 20s, according to one of the bank tellers. A second bank teller testified that the person with the dreadlocks was in his early 30s. Now, I've been doing this a long time. It's rare in an identification case you're going to get an exact match. It just doesn't happen, but that's a pretty close link. Possibly in late 20s or early 30s, was the second teller. My client was 42 years old and did not wear dreadlocks. Now, I've cited a number of facts in this case. I'm not going to go through all the facts as to the absence of evidence in this case, but I'll cite some. Not only did not one witness, not one witness identify my client or Ms. White's client, there was no DNA, fingerprints, or hair fibers found in any of the places that you would expect to be found. For example, at the bank, no fingerprints, DNA, hair fibers. The government alleges that two vehicles were used in this crime. A BMW, which was seen near the premises of the bank about an hour before the robbery. They tested, the government tested that for fingerprints, hair fiber, DNA, nothing in regard to my client, Mr. Jones. Zero. Whose BMW was it?  Mr. Cole is the co-defendant. Right. The BMW is the one that was pulled over for lack of a seat belt? Yes, sir. In addition, the government, there was a, the government. Who was driving it when it was pulled over? When it was pulled over, Mr. Cole was driving it. That was about, about 5 o'clock in the afternoon. On the day of the robbery? Yes, sir. And it had been over there in front of the bank, across the street from the bank, a couple hours before the robbery? About one hour before the robbery. It was observed by a witness on the robbery. A witness license number and all this stuff. Yes, sir. Identifying stuff. Exactly. And two black males were in the car. Two black males, one with cornrows. One with cornrows, which is akin to dreadlocks. And he had all that text messaging and cell phone evidence and followed him around. And I'll get to that right now. I submit when you read that text messages, that text messages are at best, at best give low visibility to what actually happened. Now, I've been noticing in the government pleadings and in their argument at the district court level, the government relies heavily, heavily on these text messages. And they have cherry-picked certain text messages and said, aha. And in addition to cherry-picking, they've kind of sliced and diced some of these text messages to paint them in a very sinister way. Well, to be fair, I have to look at them now and they're like most favorable to the government. You're right. You do. I agree with that. But I've likewise cherry-picked those text messages. And I submit when you look at those text messages, even in the worst case, the worst case is that you get a cloudy picture of exactly what happened. You're being presented with a bunch, a bunch of text messages that were exchanged between Mr. Cole, Mr. Jones, and a number of other people. And I submit when you read all these text messages, the ones the government wants, the ones that we want, you're left with an unclear picture at best as to exactly what they're talking about. And I would go even further. I think what you're going to hear from the government is essentially testimony from the government about the meaning of those text messages. Not one witness testified at trial, I want you to be aware, as to the meaning of those text messages. Not one. They came into evidence clean like that. And so the government essentially just takes those text messages and interprets those text messages. And they're going to be doing that to you in a few minutes, interpreting those text messages. I would submit that's akin to testifying. In any event. Mr. Quino, I'm afraid you've run out of time. Oh, I'm sorry, Judge. Yes, sir. You've got some time reserved. You'll be able to come back. Ms. White? Your client didn't join in Mr. Jones's post-trial motion for discovery, did he? I believe he did, Your Honor. And there's no order, but there is the docket text document 82, there was a motion filed. And the minutes of the hearing on that motion indicate that he had filed a motion to adopt any and all motions filed by lead counsel. And the minutes for that hearing indicate that that was granted. There is, unfortunately, no signed order to that effect. But the minutes are document 82. All right. Thank you. So he filed a motion for adoption. So it was, but it was 30 days after the fact. But the government says it's out of time, waived, and it's supposed to be filed, what, seven days or something. And they say it was 30 days before they got around to it, before you all got around to it. Before we got around to it? I think that's what they say. I mean, they'll explain it, too, but the waiver thing, they make a pretty strong argument about waiver. Your colleague here says no such thing happened, there wasn't any circumstances of waiver. I would agree with Mr. Aquino on that. But even if you give you the adoption, they say, I think they say it's out of time. They'll explain it better than I can. Yes, sir. I would disagree with that assessment. And I think that we moved to adopt the motions, that motions was granted, and we're relying on Mr. Aquino for those arguments. With regard to Mr. Cole, there were just a couple, there were other arguments put forth, and I'll just go through them briefly. With regard to the enhancement for obstruction, I think that that's a fairly cut and dry issue. The government has cited two cases where the district court can simply adopt the findings, but under Smith and Dunnegan, it's fairly clear that when there's an obstruction enhancement, that the judge has to make specific findings. And I think that that's, as laid out in Dunnegan, to not chill the defendant's right to put on evidence or to testify. And I think that that dealt, those cases dealt with testimony, but it's fairly clear that when you've got obstruction based on false evidence, that you have to make specific findings and none were made. With regard to the firearm, there was no evidence, whatever, that that firearm was used in interstate commerce. I mean, there's just none. And then with regard to the motion to suppress, I'll submit on the seatbelt issue, but I think that the probable cause for arrest was pretty thin at that point. Ms. Giles brought up in her brief under Hahn that the court can consider the entire record. She's absolutely correct in that point. But even given that— You say there was not probable cause to believe that they'd robbed the bank? No, sir, I don't— At that point? No, sir, I do not believe that there was. All he had was the stills, if you will, that simply had a build, and he knew that his car had been seen near the bank. Now, there's no evidence that I read that he had specific knowledge, but that the car, that it was facing the bank from this other parking lot, but he did know that it had been seen near the time of the robbery. But that calls into question another fact that— Acting suspiciously, according to the citizen who observed it. That's the reason he wrote down all the evidence. Well, I don't know if it's suspicious. Well, he wrote it. It was suspicious enough that this citizen wrote down the identifying data, the model and the color and the license number and all that stuff. That's how they happened to be trailing the vehicle. And they pulled it over for the seatbelt, is what they said. Yes, sir, I understand. But they said you really had probable cause right then to know that, or to believe that whoever was driving it was implicated in a bank robbery. Well, no, his boss told him that maybe it was these two guys, and then they went to the police. I mean, he didn't know right away. They were just seated in a parking lot talking. I don't think that that's particularly suspicious, but you're right. He did write down the license plate. But the interesting thing to me with regard to the facts, the government's theory is that the two men were in D.C. at 10.30 and stole this getaway van. Well, if they stole the getaway van at 10.30, why is the car across the street from the home thing-ish? I mean, that could be 1.50, and then they drive away in the van. I mean, that makes no sense to me. Where's the Beamer? Not in the parking lot. They don't ever find that. Nobody saw it near the proximity of the van. So I think that that's a very puzzling piece of evidence in this case that the government's going to say they stole the van, but yet they were there in the BMW closer to 2 o'clock. And they stole the van at 10.30. I just don't see how you can reconcile those two things. So I think I'm out of time. Thank you, Your Honors. Good morning. May it please the Court. Patricia Giles on behalf of the United States. The defendants in this case are, more specifically, Mr. Jones. There is a waiver in terms of their allegations that they're making pursuant to the Jury Services and Selection and Services Act. Now, Mr. Aquino says that he never proceeded under that act. But in fact, in the hearing before the district court, he specifically cited to that for his discovery request. He said, Congress passed the Jury Act. And in a specific section of that act, then he gives a citation. At the beginning, it indicates that each U.S. district court shall devise and place into operation a written plan for the random selection of grand and petty jurors. I would like to see that plan. Then Mr. Aquino went on to say, it goes on to that end, talking about, again, the Jury Selection and Services Act, to indicate that each district shall submit a report on their jury selection process. Then Mr. Aquino says, I would like to see that report. So he most definitely was proceeding under the Jury Selection and Services Act. This was the only time that he ever got specific about what discovery that he was seeking in reference to the jury selection process. And if you are proceeding under that act, you have to follow the timetable. He didn't, and it's waived. Now, Mr. Cole initially, early on in the case, did file a motion to adopt the motions filed by his co-defendant. But on this particular motion, he did not join this one. And if you look in the Joint Appendix at page 693, he wasn't even present. Neither his attorney nor the defendant was even present at the hearing of this motion. And that was not by accident. This one was not joined. In terms of, so right from the beginning, there's a waiver. Now, the defendants are trying to proceed under the Sixth Amendment. But the problem there is, they never stated a violation of the Sixth Amendment. Not even when they filed the motion to strike the jury panel. Because they never alleged a violation. What they said at that time was, we don't like this particular panel. They asked to strike and to get a new panel. Well, if you think that there's a problem with the process, a problem with the plan, the way that jurors are selected randomly in the district, you don't ask to get a new panel under that same plan. Because there's a problem with the plan. What they did was ask just simply for a new panel. They just wanted another chance. And that is getting very dangerous. Because what you're saying, what a defendant is saying then is, he's entitled to have this, the fair section is supposed to include a certain subset of people. You would hope that it would. I mean, I think we all would agree that we would want our jury pool to be representative of the community. I think the defendants, the court, the government, we all believe that it would give confidence to the system. But it doesn't always work that way. Because even in, and this is what the district court said below, because when you have this random process like this, sometimes you may get an anomaly. But that doesn't mean that the defendant gets to throw out that panel and demand a new one. Was there a venire that was summoned from which the panel was selected? Pardon me, Your Honor. Was there a venire assembled from which the panel for the jury was selected? Yes, Your Honor. Did it have African Americans in it? No, not the particular panel that was selected. I'm not talking about the panel, I'm talking about the venire. No, it did not. Did not. It did not. Okay. But there was some confusion because that same day, the clerk's office had given me or the government a different list. And on my list, there were four or five African Americans on my list. So there was some confusion about whether or not there would be some in the venire that we had. So you got two different panels? You were given a panel list and they were given a different one? Yes, Your Honor. But all of them came out, what about the jury wheel? All of them came out of the jury wheel? Exactly, Your Honor. So the jury wheel had African Americans in it? Yes, Your Honor. Exactly. So there obviously can't be a problem. So there were panels drawn, at least the one you had, that had African Americans on it and the one that you ultimately used didn't? Yes, Your Honor. Now, even in the, like I stated, even in the pretrial motion, the defendant never alleged a Sixth Amendment violation. He just alleged that he was entitled to an impartial jury, there were no African Americans. He cited to Wikipedia for the population, or the breakdown of population in the area, and then he cited to the article that talked about what happens when you don't have a representative jury and how sometimes the rate of conviction may be different. But again, he never challenged the plan whatsoever. So we're only looking at the Jury Selection and Services Act in this case. And even before the District Court, I think it was Judge Hamilton there pointed it out, he never, even there, it was conjecture. He talked about he wanted to conduct an investigation. He wanted to see whether or not this was just bad luck or whether or not there was something wrong with the system. Well, that's not the same as alleging that there is a problem or to set out the prima facie case or to allege the prima facie case. And in this case, that has never been done. And so the District Court appropriately called this a phishing expedition and denied their request for discovery. Now, in terms of the sufficiency of the evidence argument, this case is not like Bonner. In that case, there was no evidence putting the defendant at the scene of that robbery. But in our case, there is so much evidence here. Because we have the cell site records that put both men at the bank at various times. Now, with Defendant Cole, it was four days prior to the bank robbery. The cell site evidence puts his phone on the same street as the bank. And on that same day is when he sent a text message to his Cole defendant saying, I've got a little situation. He said y'all didn't explain that cell evidence. Somebody must have explained to the jury, it was locator systems on the phones, didn't they, that the phones were over next to the bank? Yes, we did have an expert witness to testify to that. I think what Mr. Aquino was referring to was the text messages. But the text messages weren't interpreted. Right. You let the jury figure those out. Yes, Your Honor. But when a text message reads, what's that robbery site, I don't think there needs to be much explanation. Or when the response is you have to go under commercial armed robberies in whatever county you're looking for. That's at Joint Appendix 549. So we would submit you don't need to do much to explain the substance of the text message. And we can argue that it can be interpreted one way. The defense can argue for that to be interpreted one way. But the jury, I don't know what expert can testify to what that means. In terms of the cell site evidence, did put both men at the robbery site at various locations. As I stated, Defendant Cole, it was days before, but it was on the same day that he sent this text message indicating that he was surveilling the bank. Because he also said in that same text message there were no uniforms involved. And that was the same day he was very close to the bank. The bank didn't have any guards. And the bank, in fact, did not have any guards. And then his car is seen across the street from the bank an hour prior to the robbery. And then in terms of Defendant Jones, you have his phone at 11 o'clock, being on the same day of the robbery, being close to it. So you don't have that in Bonner, but you have that in our case. And that evidence puts them in the location of the bank, both men on that day. Now, the two men who entered, they say, and they argue this at trial as well, that where there's no DNA, there's no forensics. It's the middle of June. So it's summer. And when these defendants go into that bank, they're in hoodies, jeans, hats, sunglasses, masks, and gloves. So they are virtually from head to toe covered. So there is not going to be any forensics. There's not going to be any fingerprints. But what they didn't count on was the fact that Mr. Luau would be working across the street from the bank, that he would write down that license plate, and that would lead so quickly to the recovery and apprehension of Mr. Cole. But he said it looked suspicious to him because the car was sitting out in the hot sun in the middle of the day, and it could have gotten into a shaded area. Exactly. And there are two men sitting in there facing, watching a bank. And when Mr. Cole is apprehended after Mr. Luau's tip leads to the car, and just to correct the record, it is not a car that is owned by Mr. Cole's sister. The car is registered in her name because her brother could not get insurance. You say it's owned by him? But the evidence at trial was that the car was owned and operated by Mr. Cole. It was in her name? It was in her name. So when they apprehend him, they recover the cell phone. That's how they get the text messages and also the phone number of the person that he was texting with. Now, you agree that that was a pretext stop? Yes, Your Honor. We agree. However, it doesn't matter whether it's pretext or not under the law. Also, the sister texted. What do you say they, what kind of, what did they have to stop him for? Do you think they had reasonable suspicion or probable cause anyway? We argued that, too, in the alternative below, yes. Which one do you stand on, or both? We could stand on both. Below and what the court relied on was Officer Lawrence's testimony that he saw the seatbelt violation. Well, that was the pretext part. Or was it? It was a pretext. They were going to stop him regardless. He did see it. I thought you all were going to claim that you could stop him because they were involved in the bank robbery. That was the real reason for the stop, that they were involved in the bank robbery and that the seatbelt was just a conjured up thing. Well, the seatbelt, what the exchange between the detective and Officer Lawrence prior to the stop was they wanted Officer Lawrence to find a reason to stop them. They saw, he saw, Officer Lawrence saw the seatbelt violation. But regardless, they could have stopped them. I believe they could have had a reasonable suspicion to believe that Mr. Cole was involved in the robbery. That's what I was getting at. You say it's reasonable suspicion. You don't claim it's probable cause. I think they could have even had probable cause. You don't want to give that up either. It's definitely reasonable suspicion, but I think it got stronger with probable cause once there was a stop and they were able to see the gloves in the car as well and to observe more. But definitely based on the resemblance of the body build to Mr. Cole and the car being there, I think that there would have been reasonable suspicion. In terms of the obstruction of justice enhancement, if their obstruction enhancement is based on perjury, then you need specific findings to cover the elements of the perjury. But for under Perez, or to be consistent with Perez, but under these circumstances, Judge Hilton's findings were more than adequate because what he did was adopt those findings that were laid out in the pre-sentence report. And at paragraphs 49 and 50, the probation officer went through great detail of the witnesses that testified in reference to Mr. Cole and his alibis. And the probation officer never said that either one of those witnesses committed perjury. But what was clear there was that Mr. Cole tried to give the false impression that he was someplace else instead of at the location of the bank robbing it. And that was sufficient for the obstruction of justice enhancement to apply. Let me ask you this. Ms. White, as I understood it, said that the judge never stated its reasons for the enhancement. Now, three days after the sentencing, he issued his judgment and also a statement of reasons filed under seal. Was that not made available to the defendants? Yes, it was, Your Honor. And did it state his reasons for the enhancement? I'm sorry. Yes, Your Honor. Thank you. Unless there are specific questions for the court, I will. No. I think we understand your position. Thank you. Mr. Aquino. First, I'd like to address again that jury issue. This is the first sentence of my post-trial motion. Comes now the defendant, Corey T. Jones, by counsel, pursuant to the Sixth Amendment of the United States Constitution. It's pretty clear. What she was referring to when I was talking about the plan, I was raising that as I'm interested in the plan as something that I want in the course of discovery. I knew it existed because under that jury selective service act, it does exist. So what I was trying to tell the district judge is that is information that I would like to use in the course of my investigation that you, as the court, already have. You have it, I want it, and I need it to determine whether this was bad luck or we have a Sixth Amendment violation here. So I think counsel is being unfair on how she characterizes that this was a Sixth Amendment pleading, no doubt about it, and I also raised it by Sixth Amendment in the pretrial motion. In addition, I also want the court to be aware of the jury verdict in this case. It's highly important. The jury verdict, our defense was you got the wrong guy. Jones was not there. Jones was charged with three counts, conspiracy in count one, in which the government alleged that Cole goes into the bank with Jones. Cole has a gun. Jones jumps the teller and gets the money. That's the allegations described exactly in count one. Count two was the armed robbery. Count three was use of a firearm in connection with the underlying armed robbery. Now, it's very interesting. On count three, both were charged as principals and aiders and abettors. The jury was charged on the law of aiding and abetting at Joint Appendix page 524. Mr. Jones, my client, was acquitted of that charge. Now, by definition, if he jumped the teller and you believe that Jones was there, he has to be an aider and abettor. There's just no way around it. If you think he's there and participated, he's an aider and abettor. Were you arguing that there's an inconsistent verdict? It is an inconsistent verdict. Is that your point, it's an inconsistent verdict? My point is twofold. It is an inconsistent verdict, but that's not a basis to set aside the underlying verdict. What I'm trying to highlight by that is it goes to all three issues that I raised, the importance of the jury issue, the insufficiency of the evidence, and the problem with the misstatement and argument, arguing the case that my client supposedly had a wig and used during the course of the robbery, when the evidence was just the opposite. The government's affirmative evidence, their evidence, was that the person they attribute to be Corey Jones was wearing dreadlocks. That was their case, not that they put on evidence that he was wearing a wig. So the point I'm making, the reason why— What's the distinction? You could have a wig that had dreadlocks. Well, you could have a wig— Could you not? Yes, sir. But their evidence was just the opposite. Their evidence was the person that was robbing that bank was wearing dreadlocks. They never put on evidence to suggest that he bought a wig, that he was— And the jury could infer he had a wig because he showed up in the courtroom without dreadlocks, and he was involved in the bank robbery with dreadlocks. Well, I guess— I mean, text messages and cars running around, vans stolen, and BMWs, and— Well, I want you to be aware, you say— And sending text messages back and forth about a robbery and no guards over here. This is a place to really— Let me get to one of the text— Five stacks of cash. Sure, let me get to one of the text messages. But, I mean, that's a spare argument. I mean, that comes up. Well, I mean, I just— Prosecutors can argue their case just like you can. I disagree in this respect. You could argue that this fellow doesn't have dreadlocks, has never had dreadlocks. Sure. There's no evidence of it. You could argue that, and I'm sure you did. Well, I did argue it, but my point is— They're entitled to argue it the other way. But my point is, they're the ones that put forward their case, and they're the ones that— They don't have to have direct evidence of everything. They can argue circumstantial evidence. All right, Judge, I'll move on. I want to address the question about the text message that counsel referred to and you raised. This is the one on September 23rd. It's a joint—excuse me, June 23rd. It's a joint appendix, page 585. This is what was actually said by Mr. Cole. I ain't got no enemies. I was just letting you be who you are. I got a little situation for about five stacks in about an hour. If you want in on it, it's real light work with no uniforms involved.  NPO. Sweet. Any way, or your music, or your old music, don't cuss me out. I ain't got no enemies. I was just let. So, my point is, apparently something is going to occur in about an hour. And counsel doesn't make that clear. That was said on June 23rd. The robbery of the bank occurred on June 27th. They didn't do it that day. Well, maybe they didn't do it at all, is my point. Well, under the evidence here, the jury decided that they did. Well, I know the jury did. That's right. And we look at it and the light was favorable to the government. Well, I understand that. But I go back to the question of U.S. v. Bonner. And the cell phones were over there casing the place. They were all around it. Those locators were on there. Well, my client wasn't there. And so far as Mr. Cole, you have to interpret that this supports. I'm talking about the locators on those phones where they track the phone. You're right. My client was at the bank and on that. Geographically, they were there. Understood. My client was near the bank. And the evidence that we offered, he was there at around 11 o'clock the morning of the robbery. But there was a reason why he was in that area. He had submitted job applications to Fairfax Water Company, which was located a tenth of a mile from the bank. He submitted two job applications. We had the Director of Human Resources there, one in January of 2011, and one a month after the robbery, that is in July of 2011. So approximately 30 days after the robbery occurred. So the point I'm trying to make is he had a reason to be there. Consistent with that, he submitted a job application to a CVS drug store on the day of the robbery. How many people, and I'm not trying to be a wise guy, but how many people do you know that are submitting job applications at a CVS drug store in Hyattsville, Maryland, on the day that he decides to rob a bank? And I realize the government could say, oh, he's just ginning up an alibi. That's what the man testified to. He received a resume from my client sometime between 8 o'clock in the morning and 1 o'clock in the afternoon. The robbery occurs at 2.03 p.m. What's interesting about that is one of the witnesses that I called in this case, to be fair to the government, Mr. Jones' cousin, places him in Hyattsville, Maryland, at about 12.30 on the afternoon of the robbery. That links up very well with the CVS store manager who said he received a resume from Mr. Jones sometime between 8 in the morning and 1 p.m. the day of the robbery. I submit people looking for a job are not thinking about robbing a bank. Consistent with that, a text message from Mr. Cole. I'm sorry, Judge. Thank you. I appreciate you and Ms. White representing these clients. I note you're court-appointed.
judges: William B. Traxler, Jr., Robert B. King, Clyde H. Hamilton